Your Honor, I would like to address in my oral argument two issues. First, I would like to address the on-account of element of the statutory eligibility for asylum in this case. And second, I would like to address the issue of whether the procedural stance in this case warrants an exception to the rule this Court announced in Falkon-Karish with regard to the applicability of Section 1003.1E4 to the federal regulations. I would like to reserve three minutes for my rebuttal. Your Honor, with regards to the asylum claim, it appears that there is disagreement between the petitioner and respondents in this case. What constitutes a legitimate police enforcement activity, and when a pretext of a police action is used? It doesn't really have to be legitimate, so long as it is not on account of one of the prohibitive factors. I mean, let's say the police just wanted free labor for one of their projects, which is what there's evidence in the record that that's what happened, that they needed free construction workers. We wouldn't consider that a legitimate reason, but it wouldn't be a prohibitive reason for purposes of asylum. Well, Your Honor, the question perhaps is whether in this particular case, whether even this compulsory labor that Mr. Mikhailov was subjected to falls within the domain of the asylum law. It appears that he was, based on his ethnicity, being a member of the gypsy minority, he was singled out, he was arrested, and then he was put in a form of a servitude, that is, having a severe restriction of his liberties, he was put to work for a significant period of time. Counsel, I don't quarrel with the extent of the things that were done to him being sufficient for being persecuted, but the issue that troubles me is maybe the same one that is bothering Judge Kaczynski, and that is, he believed that his ethnicity was the reason why he was, at least the second time, pulled in to go to work on these projects. But there doesn't seem to be evidence that anyone said anything that would lead him to believe that, other than his own belief, which may be sincere, but is that sufficient to prove someone else's state of mind? That is, we have to look at the state of mind of the people who arrested him. So what is there to tell us that their motivation was his ethnicity? Well, Your Honor, if we look at the record, with regard to the first arrest, he testified, and it is undisputed on the record, that he was arrested for initializing gypsy gatherings. That was the reason that was given to him. When the police... But the first arrest was, is not the one after which he was persecuted. The first arrest basically, he was let go, right? Well, Your Honor, after the first arrest, he was put in detention for 10 days. He testified that he was beaten every single day with a bag full of sand, and he was put to work, I mean, compulsory labor during the time of his detention. He was let go. The second time, what he testified, Your Honor, is that he was stopped for ID, and when they determined that he was arrested previously, they told him, you are going to be the usual suspect because we had a robbery that occurred. It appears, based on the background material that has been provided, and what the government has cited, that the police in Bulgaria believes that gypsy people are lazy, dirty people prone to crime. And based on that, it appears that because he is a gypsy, because he was a... Where does that come from in the record? Your Honor, the record, if I can just have a second. You have his experience. He is caught the second time in the suspicion of a robbery. Somebody committed a robbery, and he is caught without identification, which I believe is a crime in Bulgaria. It is in most places. Walking around without identification is itself a crime. So he gets hauled in, and he gets hauled in with suspicion of, you know, he was in the area, and he has no ID, so they suspect him of being a robber. But back to the first question about where is it in the record. Try excerpt of record 203, where they, when they entered the department, they started calling us names, gypsies don't deserve to live. Correct. That is in the excerpt of record, page 203. Yes. Also, what I was referring to the excerpt of record 140, when it says, elsewhere in the report, it says, we are not as populous as dirty, lazy, and stupid people who are prone to crime. Well, that's a mischaracterization of what is in the minds of whole groups of people. No, Your Honor, that is a human right report that was submitted as part of the background material at 140. It's one of the State Department reports. I guess here is sort of a logical question for me. Judge Helson has pointed to the testimony at the earlier, it's not probable cause, but the earlier hearing. Credible fear. Credible fear. Had too many criminal cases this week. That he did talk about the names that were called when, at the first arrest. Right. And let's assume that that demonstrates that the first arrest was on account of ethnicity. The second arrest is on account of the first arrest. So, I take it your position is that that taint from the first arrest would follow for any future arrests? Is that the theory? Well, Your Honor, in a sense, yes. And the reason for that is particularly because what he testified was that police keeps a list of who's Roma, who's not. And then he submitted a document showing, issued by the municipality, saying, this gentleman is a Bulgarian citizen of Roma ethnicity. So, it is obvious from the record. What page is that one on? That, Your Honor, is at Documentology's administrative record at 40. Forty? Forty, yes. Is that the document? Yes, that's the document that was submitted before the board as a sort of a motion to remand, I will I mean, this man is of Roma ethnicity. And the next document is that he's not a criminal. I mean, that he's not, he has never been convicted of any crime. Right. But that, you said there was a list that was kept by the police. In his testimony to Okay. But that list is not in evidence. No, it is not. I mean, he's testified, the question by the, Your Honor, I see that I have two minutes left. May I just complete? Sure. When the judge asked him, how would anybody know that you were a Roma? And he stated, well, the police know because even during communism, they were keeping lists and they know who's Turk, who's Roma in Bulgaria. So, what we have in this case is this man is arrested by the police. He goes to the police department. He is, they say that they found that he was arrested. Obviously, it was not difficult for them to find that he's a Roma. Now, what is important is in his asylum application, he clearly stated, I have been arrested three times and single for that, for those arrests because of being a gypsy and no other reason. The government is saying, well, he didn't repeat that in front of the immigration judge. However, there is no precedent. And in fact, in Okavi, this court clearly stated that when an individual puts something in his application for asylum. If he swears to its truth at the hearing. Correct. And in the beginning of the statement, he stated that he took a note and he said everything is correct. They made one correction to the asylum application and the IJ admitted it into the record. Also, he answered the questions that were posed to him by his attorney and by the trial attorney. In fact, the trial attorney was instrumental in eliciting information that there was no loud party. There was no drugs. He didn't commit anything to attract the attention the first time, except the neighbors hated him and him and his family because they're gypsies. The second time he said, nobody would believe that I have committed a robbery. Yet before they released him after torture, they make him sign a document saying, you are not mistreated in police department. Well, obviously, the reason for that is the police in Bulgaria is not interested to clean up their act. They simply want to have a protection against those gypsies that sue us. That's pretty standard in that part of the world to require suspects to sign forms that say I have been mistreated by the police. We see that in cases from other countries as well. Well, Your Honor, that may be the case. However, Mr. It's because they mistreat everybody. Well, but in this case, Mr. Mikhailov testified he was beaten with a bag full of sand and they made sure they don't hit him in the face. But obviously, those are deliberate action to inflict the maximum pain without leaving. But the fact that they the fact that they ask him to sign something saying he wasn't mistreated is not unusual. Well, it may not be unusual. We don't have a record in this case. What is usual for the police? But when the police goes and does something like this and then ask the individual to lie and tell him, unless you don't sign, we're not going to let you go. When you look at the record in the first human rights report mentioned the case of Asenov v. Bulgaria, a European Court of Human Rights case in which Bulgaria was brought before the European Court because of causing the death of a Roma individual. Now, there's another report in the record that says once the Bulgarian Human Rights Committee tried to take the case of a Roma individual and prove that there was an injustice done against him and he was arrested in a routine stop. Thank you. You're out of time. Thank you, Your Honor. Good morning, Your Honors. My name is Jennifer Parker. I represent the Attorney General, John Ashcroft, in this matter. Substantial evidence supports the immigration judge's decision that the petitioner was not persecuted on account of ethnicity or any other protected ground. The immigration judge did not consider the fact that they told him he was being held for initializing gypsy gatherings. What is your response to that? Well, what he testified to was that there were no concrete charges, but he was told he was being held for initializing gypsy gatherings. That's his own statement. There were no concrete charges according to him. What we do know is that his neighbors turned him in. But he was so uncredible, was he not? He was so uncredible, was the immigration judge. Yes, Your Honor. And he also testified when the policeman came in and forcibly entered the apartment that he started beating us, calling us names. Gypsies don't deserve to live. Isn't that an indication that they're targeting him because he is a gypsy? Well, Your Honor, the reason the police showed up at the apartment was because the neighbors complained of loud noise after midnight. That's why they came, why they showed up. And according to the petitioner, that's why they entered his apartment and they were looking for drugs as well. So there is substantial evidence in the record that supports that the police were there on legitimate. But does that justify detaining him for 10 days and beating him during those 10 days, a noise complaint? Your Honor, the immigration judge didn't get into whether the treatment rose to the level of persecution. He focused on the on account of prong, so it's difficult to, I mean, there's really nothing in the record for the government to say that that's whether it's persecution or not. I'd like to focus a little bit more on that first arrest. Let's assume that it was just a noise complaint and that they had no reason to know that the neighbors would make such a complaint because they didn't like him because he was a gypsy. Let's just say it's a random complaint of noise. Yet when they came in, they did more than say hold down the party. As Judge Nelson has pointed out, they said, you know, you're Romas and you don't deserve to live. So even if the initial call was completely legitimate and unrelated, doesn't that action upon answering the call change the calculus, necessarily change the calculus? No, Your Honor. The record does contain evidence that it was that the police showed up and arrested him on a legitimate suspicion of criminal activity that first time. It seems to me that the record certainly shows that they showed up on account of something else, a noise complaint. But my question is, once they showed up, the things that followed from that, what evidence is there of what followed from that related to something other than his ethnicity? Even what they said. They believe that he had drugs and he's the only one that says I didn't have drugs. We don't have any criminal charges. We don't know what apparently he was charged with. He was not charged with any crime. Doesn't that support his assertion that he didn't have drugs? It may support. It could support his assertion he didn't have drugs, ma'am, but it doesn't support the jump to the conclusion that he was only arrested because they thought he was a gypsy. He was clearly taken in because of the noise complaint and the suspicion of drugs. That is what the record states. That's what Petitioner stated, that that's why the police showed up. They thought he had drugs and he said he didn't, but that's a legitimate police activity to come to somebody's house and search for drugs. So whether you could do the court should focus on the fact that it's whether substantial evidence supports the immigration judge's decision. There could be other reasons. The record could support another conclusion, but because the record supports the immigration judge's conclusion that it doesn't compel a reversal. What is the law when there's a mixed motive? What if they are looking for gypsies and people who are too noisy at parties? If there's a mixed motive, what is the legal consequence of that? Well, mixed motive cases can be found to be on account of. Can or must? Yes, Your Honor. There is no clear. This is not a mixed motive case. Because the immigration judge didn't make an adverse credibility determination does not mean that every single statement and assumption that Petitioner makes is to be taken as truth. Well, I think you're correct about assumptions, but what about statements of fact? Don't we have to take all of his statements of fact as distinct from assumptions as being true? I know this court does, Your Honor, but I do not believe. That would require an immigration judge to go through every line of testimony and say, I believe this, I don't believe this. What the immigration judges usually do is say, overall, I believe that you're telling the truth, these things happen. It does not mean that they accept every single thing. You cannot expect an immigration judge to do that without going line by line through testimony. So what you have here is somebody who's saying, well, the police showed up, they looked for drugs, they called me names, I didn't have any drugs. We have his version of the story. What we do have clearly is that the police showed up on a legitimate suspicion of criminal activity. There may have been some comments made that he was a gypsy. The State Department reports support that gypsies do commonly commit crimes there. I believe they make up 6% of the population, and they commit over 50% of the crime. But there was lots of documentation in the record that revealed severe prejudice against the gypsies, especially by law enforcement officials. I mean, they report after report after report. And that certainly, if we get into a mixed motive analysis, that certainly supports the fact. Severe discrimination and harassment is not persecution. And what the country reports do show is that, yes, there is persecution and harassment of Roma gypsies. They do not support that there is widespread persecution or any persecution at all. Unfortunately, the Roma gypsies seem to be picked up more often for crime than any other segment of the population, so they make up the largest segment of the prison population. And prison abuse is widespread, so therefore they end up getting mistreated in prison more often than other people. But as Judge Kaczynski pointed out, everyone seems to be mistreated. Holding him 10 days and beating him every day for 10 days with no charges being filed. He said he was not injured during – he said he suffered no injuries. No visible effects of the beating. He did not say visible. When he was asked whether he suffered any injuries, he said no. It wasn't visible. There was no – he did say they didn't hit me in the face, but he said I didn't suffer any injuries. So he was not injured during any of these. But before you run out of time, I want to ask you the same sort of theoretical question that I asked opposing counsel. And for the sake of this question, I want you to assume that the first arrest was on account of ethnicity. And I know you don't concede that. Yes, I want you to assume it for the purpose of this question. If arrest number one is on account of ethnicity and arrest number two is on account of arrest number one, doesn't that sort of fold into itself and permit – Well, Your Honor, arrest number two is – That the whole train of events would not have happened but for his ethnicity. The second arrest, there's no evidence that that was on account of the first arrest. He was walking in an area after midnight with no identification in an area where a robbery had occurred and the police picked him up, saw him on the street and picked him up. It was not on account of the first arrest. They didn't find out about the first arrest until they got him to the police station. But he was actually picked up because he didn't have the proper identification and there had been a robbery. And it was after midnight. That is legitimate. He was kept for two weeks in detention. I'm sorry, Your Honor. He was kept for two weeks in detention for not having his papers. Well, on suspicion of committing a robbery. So one would assume that they were trying to decide if he actually had committed the robbery, which is common in this country as well where we pick up suspects and, you know, we don't know whether they've done it. It may take a few days to get charges jimmed up. Let me take you to the third arrest where they said they didn't know he was a gypsy and yet he'd been required because of the previous arrests to come every day to the station and register his name.  He didn't give real specific details other than to say I was required to come in and sign my name. And what it sounds like, as Judge Kosinski pointed out, is that they and the petitioner himself says that they wanted more free labor and they want him to go work at that construction site. Well, let's assume that's true. But then how does that justify their saying they didn't even know he was a gypsy? Well, he says that he's not even recognizable as a gypsy. That's what he testified. He doesn't look like a gypsy and you'd only know he's a gypsy if you knew his friends, which, especially on the second arrest, they wouldn't know he was a gypsy. The question was whether the officers knew he was a gypsy and my question is Perhaps at some point they knew he was a gypsy. Why wouldn't they know he was a gypsy when he came in every day to register? Well, he says he doesn't look like a gypsy unless they said are you a gypsy every day. I mean, he never said it came up. The only time he said it came up was on the first arrest. Did he say that he had to register when he came in as a gypsy? Excuse me, sir? When he came in every day to register, did he have to register as a gypsy? I don't believe the testimony supports that he registered as a gypsy. The reading that I took of that was that he had to come in and register with the police because he was It was sort of like probation. Like a probation. You check him to make sure you're not getting into trouble every day. Yes, Your Honor, and that's what he testified to. He did not testify that he was registering as a gypsy, so there's no indication that the police thought he was a gypsy. I didn't indicate he was registering as a gypsy, but I was relating the third arrest back to the second and first arrest where he said they called him names because he was a gypsy. That was only on the first arrest, Your Honor. So if we take the first arrest out and the second arrest, we can show the record amply supports the second arrest was not because of the first arrest. It was a completely separate account, and the second and third, there's no indication that anyone ever said you're a gypsy and called him names. The question is he was arrested three times, and even though the second didn't relate to the first, the question was whether the officials knew he was a gypsy. Your Honor, the record does not support that for the second and third. You will agree that I.J. could have inferred that the police knew he was a gypsy. Yes, Your Honor, he could have inferred either way. But I.J. didn't do that. He did. What you're saying is you could draw either inference from the fact. It could go either way, Your Honor, and as I said before, the standard of review here is that even if it could go either way, if the evidence supports what the immigration judge found, this court has to uphold the immigration judge's decision unless it's compelled to do otherwise. And here, there certainly supports an inference the immigration judge made that the police, at least as far as the second and third incidents, were not doing anything to him on account of him being a gypsy. Does the government take the position that Romar, an ethnic group, protected under the asylum statute? Yes, Your Honor. It would go under race, race, ethnicity. I don't quite know what it is, whether it's race, ethnicity or. . . Yes, Your Honor, we're not disputing that he would be, if it was on account of that he could possibly be eligible for grant of asylum. But I also heard you arguing that insofar as there is discrimination of some sort of persecution on account of that. I thought I heard you arguing that it's justified somehow, or was that the government position, that Romar commit more crime and therefore. . . No, Your Honor, not that they deserve to be persecuted, certainly not, and we certainly don't condone that, but. . . I should use the word. . . I mean, that they get picked up more often because. . . Unfortunately, the State Department reports do indicate that the Romar commit 50 percent of the crime in the country and are picked up more often because of that. And so, therefore, form more of the prison population, and because the abuses are widespread in the prison population, apparently it's an equal opportunity event there to mistreat prisoners. So Romar, unfortunately, are mistreated in prison more often than non-Romar, because there's more of them in prison. But there's no evidence that the guards or the police officers actually seek out Romar to put them in prison so that they can mistreat them. That would be a very big stretch from this administrative record. The administrative record does show that they do commit more crime, and therefore there's more of them in the prison population, thus more abuse. You're out of time. Thank you. Thank you. You are out of time as well. We'll give you a minute for rebuttal if you wish to take it. Yes. Can I have one minute, Your Honor? I think I just said that. Oh, I'm sorry. I didn't think you'd come second. Your Honor, I would like to point in rebuttal to what government stated. The police did not know he was a gypsy. I don't know how they can say the record does not support it when I pointed at page 40. I think what the government is arguing is that they knew it from the first arrest, and there's evidence from which one can infer they knew it in the second or third arrest. But there's inference. It's an inference that the Trial Fact can draw one way or the other way. And the Trial Fact in this case chose to draw the inference that they didn't know. Well, I agree with you if one is to look just at the testimony. But he provided a document that shows that the municipality in Burgas, the same city. They could have found out. That's why you get the inference. That's why they get the inference. If they wanted to look it up and figure it out, they clearly had the information. They could have. The government says they could draw that inference, and they did. Correct. But we had a trial judge, and the trial judge didn't draw the inference. What the government is arguing is that that's a plausible finding as well. That may be, Your Honor. However, the immigration judge clearly stated that he accepts Petitioner's assertion that he was picked up without doing anything to attract the attention of the police. So when the Petitioner went in front of the judge… Okay, this is in the second arrest? Oh, he spent in his… Are you talking about the second arrest? I'm talking what the judge says in his decision when he assessed the Petitioner testimony and learned that he was arrested three times. So when the IJ comes in and says, put it directly, I am prepared to accept the factual assertion, and there is clearly Petitioner testimony on several occasions. He can testify as to what he did and what he saw, but he really can't testify. The IJ doesn't have to, even if it believes him as to all facts, it doesn't have to believe him as to his suppositions as to what's in the head of the police. You know, he may think he wasn't doing anything, but he is in the area where robberies are committed. He hasn't got maybe to stop everybody in the area asking for identification, which is not uncommon even in this country. Right. It's close enough to a robbery that they look at everybody and try to sort of figure out who might have done it and stop people. It isn't… And he doesn't have identification, which, again, is a crime in itself. Oh, absolutely not. There is no question. But what Eliza Correa stated, and every court after that has said, is we don't require the individual to come in and prove what the Persecutor did because the reality is Persecutors rarely give a certificate saying, we are persecuting you because you are X. What the Supreme Court says, we need some evidence, direct or circumstantial. What we have here is a gentleman who testified, and he testified credibly according to the immigration judge, and he testified on several occasions. Bulgarians don't believe we are whole people. They believe that they take pride to take crack on us. They hate us. People don't like us. Counsel, is there anything in the record that shows anything about the size of the city in which he lived? Yes, Your Honor. I believe he testified that the city was about 200,000 people. That's what the statement that was made during the testimony. The judge asked him, and there was no further questions regarding it. Okay. Thank you. Thank you. The case is now in the stand submitted. We are now adjourned. All rise. Court is adjourned.
judges: Dw Nelson, Kozinski, Graber